Stanton T. STORY, Petitioner,

v.

Warden Tom KINDT, Respondent and the Attorney General of the Commonwealth of Pennsylvania, Additional Respondent.

Civil Action No. 92–281.

United States District Court, W.D. Pennsylvania.

Feb. 7, 1997.

Michael D. Bartko, Shelley stark, Fed. Public Defender's Office, Pittsburgh, PA, Paul H. Titus, Titus & McConomy, Pittsburgh, PA, for plaintiff.

Stanton T. Story, White Deer, PA, pro se.

Maria V. Copetas, Thomas N. Farrell, Office of the Dist. Atty., Pittsburgh, PA, for defendants.

### MEMORANDUM ORDER

BLOCH, District Judge.

Petitioner's petition for writ of habeas corpus was received by the Clerk of Court on February 12, 1992, and was referred to United States Magistrate Judge Ila Jeanne Sensenich for report and recommendation in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates.

The magistrate judge's report and recommendation, filed on February 17, 1997, recommended that the petition be denied and that a certificate of appealability be granted with respect to the issue of whether Petitioner was deprived of his Sixth Amendment right to be tried by an impartial jury by reason of the fact that his jury was death qualified. The parties were allowed ten (10) days from the date of service to file objections. Service was made on Petitioner by delivery to counsel and on Respondents. Objections were filed by Petitioner on March 10, 1997. Respondents filed a response to the objections on March 24, 1997. After *de novo* review of the pleadings and documents

in the case, together with the report and recommendation and objections and response thereto, the following order is entered:

AND NOW, this 31st day of March, 1997,

IT IS HEREBY ORDERED that the petition is denied.

IT IS FURTHER ORDERED that a certificate of appealability is granted with respect to the issue of whether Petitioner was deprived of his Sixth Amendment right to be tried by an impartial jury by reason of the fact that his jury was death qualified.

The report and recommendation of Magistrate Judge Sensenich, dated February 7, 1997, is adopted as the opinion of the court.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SENSENICH, United States Magistrate Judge.

### I. RECOMMENDATION

It is recommended that the petition for writ of habeas corpus be denied. It is further recommended that a certificate of appealability be granted with respect to the issue of whether Petitioner was deprived of his Sixth Amendment right to be tried by an impartial jury by reason of the fact that his jury was death qualified.

### II. REPORT

Petitioner brings this habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his second conviction of first degree murder of a police officer after his first conviction was reversed on appeal by the Supreme Court of Pennsylvania. Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155 (1978). Both convictions resulted in sentences to death which were subsequently vacated. During his first appeal the death penalty statute in existence was declared unconstitutional. Commonwealth v. Moody, 476 Pa. 223, 382 A.2d 442 (1977), cert. denied, 438 U.S. 914, 98 S.Ct.

3143, 57 L.Ed.2d 1160 (1978). His second death sentence was vacated because the new death penalty statute was enacted after commission of his crime. Commonwealth v. Story, 497 Pa. 273, 440 A.2d 488 (1981).

This case is now back on remand from the Court of Appeals. On August 14, 1992, a report and recommendation was filed, recommending that the petition, filed on December 4, 1991 by Petitioner Stanton T. Story, be dismissed as a mixed petition because it raised some claims not exhausted in the state courts. (Doc. # 15.) On September 16, 1992, the district court adopted the report and recommendation. (Doc. # 17.) On October 1, 1992, Petitioner filed an appeal in the Court of Appeals for the Third Circuit, and on May 28, 1993, the court issued a certificate of probable cause.[1]

On May 27, 1994, the Court of Appeals reversed the decision of the district court, holding that, because of extensive delay in the processing of Petitioner's Post Conviction Hearing Act (PCHA)[2] petition, which was attributable primarily to the Allegheny County docketing system, exhaustion should be excused and the habeas corpus petition should be addressed on the merits. This opinion was published as Story v. Kindt, 26 F.3d 402 (3d Cir.1994), cert. denied, 513 U.S. 1024, 115 S.Ct. 593, 130 L.Ed.2d 506 (1994). Following remand Petitioner was ordered to file an amended petition by September 30, 1994 and an evidentiary hearing was set for January 10, 1995. Subsequently, Petitioner appealed to the United States Supreme Court, which denied his petition for certiorari. 513 U.S. 1024, 115 S.Ct. 593, 130 L.Ed.2d 506 (1994) The evidentiary hearing scheduled for January 10, 1995 was continued generally. Petitioner then chose to exhaust all of his state court remedies and sought an extension of time to file his amended petition up to sixty (60) days after he had exhausted all of his state court remedies. His amended petition was filed on October 2, 1995 by Michael D. Bartko of the Federal Public Defender's

---

1. In the amendments enacted on April 24, 1996, § 2253 was amended and the certificate of probable cause was renamed a certificate of appealability.

2. The PCHA, 42 Pa.C.S. §§ 9541–51, was amended in 1988 and renamed the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–46 (PCRA). The PCRA was subsequently further amended in 1995. Neither of these amendments is relevant to this case.

Officer, who had been appointed to represent Petitioner in these proceedings. (Doc. # 30.) Respondents filed an answer to the amended petition on December 4, 1995 (Doc. # 31), and supplemental answers on April 18 (Doc. # 48) and June 12, 1996 (Doc. # 49). On March 12, 1996, Petitioner filed a motion for an evidentiary hearing, which the Court denied by order dated June 17, 1996 (Doc. # 46). On June 27, 1996, Petitioner filed a Motion to Reconsider His Request for an Evidentiary Hearing. (Doc. # 50.) That motion is being denied pursuant to an opinion and order filed on the same date as this report and recommendation.

In addition, the following procedural history has occurred in the state courts. Following remand by the Superior Court of Petitioner's PCHA petition (Answer Ex. 12),[3] Judge George H. Ross of the Court of Common Pleas of Allegheny County, Pennsylvania appointed Jerome DeRiso to represent Petitioner on February 4, 1993. Thereafter, Judge Ross issued several orders upon Attorney DeRiso to file an amended PCHA petition (Answer Exs. 14, 18), but the amended petition was not filed until February 14, 1994.

In the amended PCHA petition, Petitioner raised the following claims:

Petitioner's conviction resulted from the ineffective assistance of counsel which, in the circumstances of this particular case, so undermined the truth-determining process, that no reliable adjudication of guilt or innocence could have taken place, as more particularly set forth as follows:

a. Petitioner maintains that his trial counsel was ineffective in that he did not interview Robert Davis, as he was the person that shot the police officer.

b. Trial counsel was ineffective for failing to interview Lafayette Jones to determine if he saw who shot the police officer, and who could have testified that Petitioner's hair was in an afro-style, and the Robert Davis' hair was platted.

c. Trial counsel was ineffective for not interviewing Jim–Jim Davis who could have testified that Petitioner's hair was in an afro-style while Davis' hair was platted.

d. Trial counsel was ineffective in that he did not interview S.T. Story, Petitioner's father, who cooked breakfast for both Petitioner and Davis the morning of the shooting. S.T. Story would have put Davis with Petitioner the morning of the shooting, would have testified that Petitioner did not have a gun, would have testified that Petitioner's hair was in an afro-style, and that Davis' hair was platted.

e. Trial counsel was ineffective as he did not interview Sandy Sommers, who was the woman identified as talking with Davis and Petitioner before the shooting, [who would have testified] that both Davis and Petitioner were in the car, that Petitioners hair was in an afro-style, and that Davis' hair was platted, and that Petitioner was a passenger in the car.

f. Trial counsel was ineffective in that he did not interview any of Lafayette Jones' family who saw Petitioner with Davis earlier that morning, and who could have testified that they were together, that Petitioner's hair was in an afro-style and that Davis' hair was platted.

Petitioner was tried before a death penalty qualified jury in the Court of Common Pleas of Allegheny County, Criminal Division, on October 12, 1979.

Although defense counsel filed the Motion for the court to prohibit the prosecution from seeking the death penalty, the

---

**3.** Although counsel had been appointed to represent Petitioner with respect to his PCHA petition, counsel "did not file an amended petition or take any other action. Under these circumstances, the defendant, the Commonwealth and we all agree that this case must be remanded for appointment of counsel to represent defendant in the filing of an amended PCHA petition and any further proceedings." (Answer Ex. 12.) There-

fore, the Superior Court vacated the dismissal of Petitioner's PCHA petition and remanded to the Court of Common Pleas for further proceedings on April 19, 1985.

Exhibits 1–12 are attached to Respondents' original answer (Doc. # 11), which was filed on May 11, 1992. Exhibits 13–35 are attached to Respondents' answer to the amended petition (Doc. # 31).

Motion was denied and the death penalty qualified jury was selected. On appeal, the Pennsylvania Supreme Court ruled that the Pennsylvania Death Penalty Statute was not in effect at the time of the murder, and therefore violated the Ex Post Facto Clause of the Constitution of the United States.

Petitioner's right to an impartial jury and his Due Process Rights under the Constitution of the United States were violated by having a trial before a death penalty qualified jury.

Petitioner's sentence of life imprisonment by the Pennsylvania Supreme Court is illegal and an invalidation of the Constitution of the Commonwealth of Pennsylvania in that the Petitioner's right of allocution was denied.

(Answer Ex. 20 ¶¶ 9–13.)[4] On February 22, 1994, an evidentiary hearing began. (Answer Ex. 21.) This hearing continued on March 1, 1994, at which time Petitioner questioned his trial counsel, Charles Schwartz, about Schwartz's alleged ineffectiveness at Petitioner's second trial in October 1979. (Answer Ex. 22.)

Before the hearing concluded, Petitioner himself read into the record the following issues he wanted to raise: trial counsel was ineffective for failing to object when Detective Robert Miller was not asked about his expert credentials, when hearsay was given by Officers Stotlemyer and Freeman, when irrelevant testimony about the cadillac was given by William Bebler, when the testimony of Alene Smith and Nadine Brown was read

into the record in violation of both the Confrontation Clause and the Due Process Clause because only parts were read in, and when the testimony of these witnesses improperly presented a prejudicial hearsay admission that Petitioner was in the presence of two individuals involved in the shooting while he was in Florida; appellate counsel was ineffective for not raising trial counsel's failure to object to Peter Marone acting as a gun expert, for not raising trial counsel's failure to argue that the testimony of Alene Smith and Nadine Brown had been improperly read into the record, for not raising trial counsel's overruled objections to have stricken the testimony of Detective Swearingen who had taken handwritten notes and thrown them away prior to trial, and for failing to raise all issues that were not raised by trial counsel. (Answer Ex. 22 at 23–27, 47–49, 51.)[5] On March 16, 1994, Judge Ross denied the PCHA petition. (Answer Ex. 23.)[6]

Counsel filed an appeal in the Superior Court, which was docketed at No. 626 Pgh. 1994, and Petitioner filed his own *pro se* appeal, which was docketed at No. 826 Pgh. 1994. The counseled appeal raised the following issues:

A. WHETHER OR NOT COUNSEL FOR [PETITIONER] WAS INEFFECTIVE FOR FAILING TO INTERVIEW POTENTIAL WITNESSES AND FAILING TO MAKE REASONABLE INVESTIGATIONS INTO [PETITIONER'S] DEFENSE.

B. WHETHER OR NOT [PETITIONER'S] RIGHT TO AN IMPARTIAL

---

4. Although Petitioner states that he was brought to trial on October 12, 1979, what occurred on that date was an in-chambers discussion of proposed voir dire questions. (TT Vol. I.) The actual trial began on October 22, 1979. (TT Vol. IV.)

5. These are the same issues that Petitioner added to his habeas corpus petition in this Court when he was filed his amended petition on October 2, 1995. In addition, Petitioner tried to raise two other issues before Judge Ross: failure of trial counsel to object to a photograph of the position the victim was lying in and error by the trial court in overruling trial counsel's objections and permitting Robert Levine to testify to the firearms used in the shooting. (Answer Ex. 22 at 24, 26.) However, Petitioner has not raised those two issues in this petition.

6. The Court of Appeals stated that "[t]he only activity on Story's petition since June 5, 1985 has been the recent appointment of his third PCHA attorney (Jerome DeRiso) on February 24, 1993, and the filing of an amended petition a year later on February 14, 1994." 26 F.3d at 404. Although this was true when the case was argued on February 15, 1994, counsel must have known that the PCHA hearing, which began on February 22, 1994, was about to take place. Moreover, by the time the Court of Appeals issued its *decision* on May 27, 1994, the PCHA hearing had concluded, Judge Ross had issued an order denying the petition, and Petitioner had appealed to the Pennsylvania Superior Court.

JURY AND HIS DUE PROCESS RIGHTS UNDER THE CONSTITUTION OF THE UNITED STATES WERE VIOLATED BY HAVING A TRIAL BEFORE A DEATH PENALTY QUALIFIED JURY.

C. WHETHER OR NOT THE PENNSYLVANIA SUPREME COURT ERRED IN SENTENCING [PETITIONER] TO LIFE IMPRISONMENT IN THAT [PETITIONER'S] RIGHT OF ALLOCUTION WAS DENIED.

(Answer Ex. 26 at 3.) On June 14, 1994, the Superior Court dismissed the *pro se* appeal at No. 826 as duplicative of the counseled appeal at No. 626. (Answer Ex. 25.) On September 29, 1994, Judge Ross issued his opinion on the denial of the PCHA petition. (Answer Ex. 24.) On April 5, 1995, the Superior Court affirmed the decision of the PCHA court. (Answer Ex. 30.) On April 12, 1995, Attorney Bartko sent a letter to Attorney DeRiso with a copy to Petitioner informing him of the Superior Court's decision. (Ex. A to Exs. 31–32.)

Petitioner did not file a timely appeal in the Pennsylvania Supreme Court. However, on June 19, 1995, he filed a *pro se* pleading in both the Superior Court and the Supreme Court requesting permission to file an appeal *nunc pro tunc*. (Answer Exs. 31–32.) The Superior Court denied his pleading on June 30, 1996, and the Supreme Court denied the petition to appeal *nunc pro tunc* on September 8, 1995. (Answer Exs. 33–34.) No further filings took place.

In the amended petition, filed October 2, 1995, Petitioner raises the following claims:

I. WHETHER THE JURY WAS UNCONSTITUTIONALLY SELECTED IN THAT THE JURY WAS DEATH QUALIFIED WHEN STORY SHOULD NOT HAVE BEEN TRIED UNDER THE DEATH PENALTY STATUTE?

II. WHETHER STORY WAS DENIED HIS CONSTITUTIONAL RIGHT UNDER THE SIXTH AMENDMENT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS DUE PROCESS RIGHTS AS APPLIED TO THE STATES UNDER THE FOURTEENTH AMENDMENT, NAMELY:

(a) Counsel's failure to investigate any part of Story's defense;

(b) Counsel's failure to object to evidence at numerous phases of the trial that were extremely prejudicial and inadmissable [sic] if properly objected to;

(c) Counsel's failure on direct appeal to raise errors made by the trial court?

III. WHETHER THE PENNSYLVANIA SUPREME COURT ERRED IN SENTENCING STORY TO LIFE IMPRISONMENT INSTEAD OF REMANDING THE CASE TO THE ALLEGHENY COUNTY COURT OF COMMON PLEAS FOR RESENTENCING?

(Doc. # 30 at 1–2.) Specifically, Petitioner alleges that counsel was ineffective for failing to investigate and interview Robert Davis, LaFayette Jones, "Jim–Jim" Davis, Petitioner's father S.T. Story, Sandy Sommers, and any of the Jones family who saw Petitioner with Robert Davis the day of the shooting. (*Id.* at 20–21.) Further, he alleges that counsel failed to object when Detective Robert Miller was not asked about his expert credentials (*Id.* at 26), when hearsay was given by Officers Stotlemyer and Freeman (*Id.* at 26–27), when irrelevant testimony about the cadillac was given by William Bebler (*Id.* at 27), when the testimony of Alene Smith and Nadine Brown was read into the record in violation of both the Confrontation Clause and the Due Process Clause because only parts were read in (*Id.* at 27), and when the testimony of these witnesses improperly presented a prejudicial hearsay admission that Petitioner was in the presence of two individuals involved in the shooting while he was in Florida. (*Id.* at 28–29.)

Petitioner alleges that appellate counsel (Attorney Schwartz, assisted on the brief by Welsh White) was ineffective for not raising trial counsel's failure to object to Peter Marone acting as a gun expert (*Id.* at 30), for not raising trial counsel's failure to argue that testimony of Alene Smith and Nadine Brown

had been improperly read into the record (*Id.* at 31), for not raising trial counsel's overruled objections to have stricken the testimony of Detective Swearingen who had taken handwritten notes and thrown them away prior to trial (*Id.* at 31), and for failing to raise all issues raised in II(a-b) that were not raised by trial counsel (*Id.* at 32).

Of these claims, the ones that were added in the amended petition were the failure to interview Petitioner's father and witness Sandy Sommers, and all claims raised in II(b-c) above (as noted above, these were the issues that Petitioner tried to raise by reading them to Judge Ross at the conclusion of the PCHA hearing). Respondents argue that: 1) the Court of Appeals excused exhaustion only as to those claims that were present in the petition in 1994, not newly added claims; 2) Petitioner's failure to file a timely appeal in the Pennsylvania Supreme Court and that court's denial of his petition for allowance of appeal *nunc pro tunc* are procedural defaults preventing this Court from addressing Petitioner's new claims unless he demonstrates either "cause" for the default and actual prejudice resulting therefrom or that the failure to address these claims will result in a fundamental miscarriage of justice, and he has not met either of these exceptions; 3) Petitioner's claim relating to the death qualified jury was decided on the merits by the state courts and their findings of fact (and perhaps, under newly enacted habeas statutes, their findings of law and mixed fact and law issues) are entitled to a presumption of correctness; 4) Petitioner's claim of counsel ineffectiveness for not interviewing witnesses fails on the merits because he cannot demonstrate that he was actually prejudiced by this allegation of ineffectiveness and because counsel did make efforts to locate many of these witnesses; and 5) Petitioner's claim regarding the action of the Pennsylvania Supreme Court in resentencing him instead of remanding the case, assuming that it raises an issue cognizable in federal habeas corpus, should be denied on the merits because there is no relief the Court can grant him.[7] Petitioner asserts that the Court of Appeals excused exhaustion in his case completely, so that his newly added claims should be addressed on the merits, and he argues, in the light of Judge Cowen's dissenting opinion, that his death qualified jury claim has merit and entitles him to a writ of habeas corpus.

*Status of Newly Added Claims*

█ Ordinarily, the first issue that must be addressed by a federal district court when considering a habeas corpus petition filed by a state prisoner is whether the prisoner has exhausted available state court remedies as required by 28 U.S.C. §§ 2254(b) and (c). Section 2254(b)(1) (as amended Apr. 24, 1996) provides:

An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B) (i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

Furthermore, § 2254(c) provides:

An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the state to raise, by any available procedure, the question presented.

It is well settled that, as a matter of comity, the state should be provided with the first opportunity to consider the claims of constitutional violations and to correct any errors committed in its courts. *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982); *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Accordingly, before a state prisoner's claims may be addressed by a federal habeas court, the constitutional issues must first have "been *fairly presented* to the state courts" for review. *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989) (quoting *Picard v. Con-*

---

7. Because Respondents argue that Petitioner's newly added claims are unexhausted and/or pro-cedurally defaulted, they have not addressed these claims on the merits.

*nor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)).

However, in its opinion remanding the case, the Court of Appeals held as follows:

We find it wholly untenable to penalize Story for his attorneys' failures and the Court of Common Pleas' inability to manage its own docket. Nor do we consider recent progress on Story's PCHA petition sufficient to require him to afford the state's courts three more years, in addition to the nearly nine already consumed. The Commonwealth simply has not met its burden to show why, in light of its inordinate and inexcusable delay, we should not excuse exhaustion. We will therefore reverse the order dismissing the habeas petition and remand the case to the district court with directions to entertain Story's petition on the merits.

26 F.3d at 406 (footnote omitted). At least one of Petitioner's claims had not previously been presented to any court (the claim concerning the Pennsylvania Supreme Court sentencing him to life imprisonment rather than remanding to trial court), yet the Court of Appeals ordered that exhaustion be excused in this case because of inordinate delay by the Commonwealth. It is therefore unlikely that the Court of Appeals would now require Petitioner to exhaust state remedies with respect to claims added to the petition after remand, even if these claims had not been previously presented to the state courts. In addition, some of the newly added claims raise issues already presented by the original petition; they merely name other individuals whom trial counsel allegedly failed to interview or investigate, and they present the same issues against appellate counsel as were presented against trial counsel. Therefore, the Court will not have to address on the merits issues unrelated to those already considered by the state courts. Other issues raise evidentiary rulings, ques-

tions of state law that are not cognizable in federal habeas corpus. Under the unusual circumstances of this case, the Court should consider exhaustion to have been satisfied or waived by the Court of Appeals and should proceed to the merits of all claims in the petition, except those presenting issues of state law.[8]

*Standard of Review*

Previously, § 2254(d) required that a determination of a factual issue, after a hearing on the merits by a state court of competent jurisdiction in a proceeding to which the petitioner and an officer of the state were parties and which was evidenced by reliable and adequate written indicia, be presumed correct unless one of eight exceptions applied. However, mixed questions of law and fact and conclusions of law had to be reviewed by a federal court *de novo*. *See Wright v. West*, 505 U.S. 277, 305, 112 S.Ct. 2482, 2497, 120 L.Ed.2d 225 (1992) (O'Connor, J., concurring in the judgment) *See, e.g., Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (state court findings of fact concerning counsel's performance subject to presumption of correctness, but ultimate conclusion that counsel was not ineffective requires independent review by federal court).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (the AEDPA), which revises many of the procedures for habeas corpus proceedings. Section 104(4) of the AEDPA amends the section on factual presumptions, redesignated § 2254(e), to read that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Moreover, section 104(3) adds a new subsection 2254(d), which states that:

---

**8.** Respondents also argue that Petitioner's untimely petition for allowance of appeal in the Pennsylvania Supreme Court and that court's denial of the petition represent procedural defaults barring the Court from reviewing any issues presented therein. The Court of Appeals has held that "the Pennsylvania Supreme Court's denial of an untimely petition for review [means]

that it deemed the petition to be procedurally barred." *Caswell v. Ryan*, 953 F.2d 853, 860 (3d Cir.1992). However, the issue of exhaustion must be resolved before the issue of procedural default, and because the Court of Appeals has excused exhaustion with respect to all of Petitioner's claims in this case, the issue of procedural default does not arise.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Respondents argue that new section 2254(d) provides for a more lenient standard of review for state court mixed findings of fact and law and that the new provisions should be applied in this case, although the case had been filed prior to the date the amendments of the AEDPA were enacted. However, the retroactivity issue is significant only if it would alter the result. "Of the circuit courts of appeals that have had the opportunity to consider the retroactivity issue, two courts have determined that the AEDPA's changes to § 2254 are not to be applied retroactively, *see Boria v. Keane,* 90 F.3d 36 (2d Cir.1996) and *Edens v. Hannigan,* 87 F.3d 1109, 1112 n. 1 (10th Cir.1996), and one court has found that the AEDPA is to be applied retroactively in non-capital cases. *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (*en banc* )." *Berryman v. Morton,* 100 F.3d 1089, 1102 (3d Cir.1996). However,

having outlined these two approaches, the Court of Appeals in *Berryman,* as it had previously, noted that the result would have been the same under either standard and thus it did not resolve the retroactivity question. *See Meyers v. Gillis,* 93 F.3d 1147, 1149 n. 1 (3d Cir.1996); *Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir.1996). *See also Ayala v. Speckard,* 89 F.3d 91, 96–97 (2d Cir.1996); *Baylor v. Estelle,* 94 F.3d 1321, 1325 (9th Cir.1996). The Court need not determine whether this new section applies, because under either standard, Petitioner's claims should be denied.

*Sixth Amendment Claim Based on Impartiality of Jury*

■ Petitioner's first claim is that the "death-qualification" of his jury resulted in a violation of the Sixth Amendment because at the time of his second trial he was not eligible for the death penalty. Thus, Petitioner's attack is upon the death qualification of the jury under the circumstances of his case, rather than a challenge to individual veniremen as having been wrongfully excluded from the jury pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968),[9] which held that exclusion from the jury of persons who had conscientious scruples against capital punishment or who were opposed to it did not establish that the jury was biased with respect to the petitioner's guilt, but that it did deprive him of the impartial jury he was entitled to under the Sixth and Fourteenth Amendments on the question of punishment.

**9.** Petitioner had challenged the Commonwealth's exclusion for cause of six veniremen on *Witherspoon* grounds in his post-verdict motions and on appeal to the Pennsylvania Supreme Court. (Answer Ex. 5 at 2; Ex. 7 at 20.) Judge Ross reviewed the record and concluded that the veniremen had been properly excluded. (Answer Ex. 6 at 12–14.) The Pennsylvania Supreme Court also reviewed the voir dire and concluded that the jurors who were excluded for cause had been properly excluded under *Witherspoon. Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488, 489 n. 1 (1981). Moreover, Justice Larsen (who, along with Justices Flaherty and Kauffman, dissented from the majority opinion only insofar as it determined that the newly enacted death penalty statute should not apply to Petitioner), wrote an alternative opinion of the court that explained in detail why the court found Petitioner's *Wither-*

*spoon* claim, as well as his other claims, meritless. *Id.,* 440 A.2d at 493–509 (Larsen, J., dissenting). As Judge Ross had concluded, Justice Larsen would not have found the exclusion of the veniremen improper. *Id.* at 507–08 & n. 20.

Even if Petitioner had raised the issue of the exclusion of particular veniremen in this petition, however, the Court may not reach the merits of the claim because the Supreme Court has held that a trial court's determination, in voir dire records duly recorded, that a prospective juror was properly excluded for cause under *Witherspoon* and *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980) is a factual issue entitled to a presumption of correctness under § 2254(d) (now in § 2254(e) pursuant to the AEDPA amendments). *Wainwright v. Witt,* 469 U.S. 412, 427–29, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985).

In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), voir dire at defendant McCree's trial resulted in the exclusion of eight potential jurors who stated that they could not apply the death penalty under any circumstances, and McCree claimed that the jury that remained was more prone to convict in violation of the requirements of the Sixth and Fourteenth Amendments that a defendant have his guilt or innocence determined by an impartial jury selected from a representative cross section of the community. The district court examined the social science studies submitted and granted the writ, but the Eighth Circuit affirmed only as to the fair cross section claim, not reaching the impartiality claim. *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985).

The Supreme Court noted that of the fifteen studies submitted by McCree, only six actually measured the potential effect on guilt-innocence determinations of the removal of *"Witherspoon*-excludables," [10] at three of those six studies were presented and found to be too tentative and fragmentary in *Witherspoon* itself, and that the remaining three did not provide substantial support for the per se constitutional rule McCree advocated. 476 U.S. at 168–73, 106 S.Ct. at 1762–65. Nevertheless, the Court assumed for the purposes of the case that the studies were valid and that death qualification in fact produces juries that are somewhat more conviction prone than non-death qualified juries. Even so, the Court held that this process did not offend the fair cross section requirement of the Sixth Amendment because that requirement has never been extended to petit juries on any issues, only jury panels and venires. *Id.* at 174–75, 106 S.Ct. at 1765–66.

Secondly, even if it applied at this level, the fair cross section requirement refers to distinctive groups (blacks, women, Mexican–Americans) not people who share a common attitude (i.e., opposition to the death penalty), nor does the exclusion of people on this basis provide an "appearance of unfairness." Also, only those who cannot set aside their beliefs to follow the law may be so excluded, and those that are excluded may serve in other cases and they are treated like any other juror who expresses an inability to follow the law. Furthermore, with regard to McCree's claim that the exclusion of these jurors created an impartial jury slanted toward conviction, the Court rejected the notion of "balancing" various juror predispositions in accordance with previous case law. The circumstances in *McCree* differed from those in *Witherspoon* and Adams in that the Arkansas process in *McCree* did not improperly remove jurors who had some philosophical questions about the death penalty, but only those who would not apply it in any circumstance, which is permitted. The other cases dealt with capital sentencing, whereas *McCree* was challenging the basic finding of guilt or innocence (he was sentenced to life without parole).

In *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), defendant Buchanan, a minor who was not subject to the death penalty, was tried jointly with Stanford, an adult who not only raped and sodomized the victim but actually shot her. The jury was "death qualified" because Stanford's crimes made him eligible for the death penalty, and Buchanan filed a habeas corpus action challenging the death qualification of the jury. Buchanan's claim of a fair cross section violation was rejected on the basis of Court's holding in *McCree. Id.* at 415–16, 107 S.Ct. at 2913–14. As for his claim that he had been improperly tried jointly with Stanford, the Court held that Kentucky had an interest in promoting reliability and consistency by trying actors in same events together (and Buchanan had not moved to sever the trials in any event). *Id.* at 416–20, 107 S.Ct. at 2914–16.

In *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Su-

---

**10.** *"Witherspoon*-excludable" ... refers to a prospective juror whose conscientious or religious scruples toward the imposition of the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "

*Story,* 26 F.3d at 407 n. 1 (Cowen, J., dissenting) (quoting *United States v. Salamone,* 800 F.2d 1216, 1219 n. 6 (3d Cir.1986) (citations omitted)).

preme Court reiterated a conclusion reached in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988): a defendant may challenge for cause a venireman who indicates that he will automatically vote to impose the death penalty when that option is available to him (referred to in social science studies as an A.D.P. for automatic death penalty, *see People of the State of California v. Middleton,* 244 Cal.Rptr. 378, 391 n. 17 (Cal.Ct.App.1988), *review denied without opinion* ). However, the Court noted that Illinois' improper procedure in the case required only the reversal of the defendant's death sentence and had no bearing on his conviction. *Id.* at 739 n. 11. In *Ross,* the defendant's claim of an impartial jury failed because after the trial court rejected the challenge of the A.D.P. for cause, defense counsel exercised a peremptory challenge to remove him. 487 U.S. at 85–86, 108 S.Ct. at 2277. Thus, even when considering the challenges to the death qualification process, the Supreme Court has indicated that a defendant must demonstrate that his particular jury was non-neutral because otherwise, he is not entitled to any relief.

Similarly, the Pennsylvania Supreme Court has held that death qualifying a jury does not violate any rights under Pennsylvania law and has followed the reasoning of the United States Supreme Court in *McCree.* *See Commonwealth v. Blystone,* 519 Pa. 450, 549 A.2d 81, 91–92 (1988), *aff'd on other grounds,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373, 384 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656, 663–64 & n. 8 (1986), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987); *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987). The Pennsylvania Supreme Court has also found, following *McCree,* that death qualified juries are not more prone to convict. *See Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264, 1283 (1989); *Commonwealth v. Smith,* 511 Pa. 343, 513 A.2d 1371 (1986); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 817–18 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986).

Petitioner's claim herein arises because, after his first trial in 1975, the Pennsylvania death penalty statute pursuant to which he was sentenced to death was declared unconstitutional by the Pennsylvania Supreme Court. *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied,* 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). Before his second trial in 1979, the Legislature enacted the Act of September 13, 1978, P.L. 756, No. 141, § 1, 42 Pa.C.S. § 9711. Thus, the question presented was whether the newly enacted death penalty statute could properly be applied to Petitioner for a crime committed in 1974.

Attorney Schwartz filed a Petition to Prevent the Commonwealth From Seeking the Death Penalty on April 19, 1979. (Answer Ex. 1.) Judge Ross denied this motion on April 24, 1979 and issued an extensive opinion in which he addressed five arguments presented by Petitioner as to why the new statute should not apply to him (effect of an unconstitutional statute, ex post facto laws, double jeopardy, equal protection, due process). (Answer Ex. 2.) Nevertheless, because the issue presented "a controlling question of law as to which there is substantial ground for difference of opinion," Judge Ross certified the order for immediate appeal to the Pennsylvania Supreme Court. (Answer Ex. 3.) However, on June 9, 1979, the Pennsylvania Supreme Court denied the petition for permission to appeal without comment (Answer Ex. 4), and therefore Judge Ross permitted the prosecution to proceed with the case as a death penalty case. Judge Ross could not have known that the Pennsylvania Supreme Court would later find, by a 4–3 vote, that the newly enacted death penalty statute could not be applied to Petitioner in this case. *Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488 (1981). Indeed, he noted this unfortunate turn of events at Petitioner's PCHA hearing (PCHA Hr'g, Answer Ex. 22, at 39–40).

Judge Cowen's dissenting opinion states that, because of a state legislative mandate against construing new statutes retroactively in the absence of clear and manifest language from the Legislature indicating otherwise, "it

was clear before the second trial that Story was not eligible for capital punishment pursuant to the newly enacted Act of 1978 because he allegedly committed the offense in 1974." 26 F.3d at 408 (Cowen, J., dissenting) (footnote omitted). Further, Judge Cowen concludes that the Supreme Court "was not without difficulty in permitting the use of death-qualified juries even in then limited circumstances" of *McCree* and *Buchanan* and that the justifications supporting death qualification in those cases (the fact that the defendant himself was eligible for the death penalty if convicted, the state interest in holding joint trials of co-defendants) are absent in this case. *Id.* at 410. Judge Cowen further cites *People of the State of California v. Middleton*, 244 Cal.Rptr. 378, 396 n. 25 (Cal.Ct.App.1988), *review denied without opinion*, (Cal. May 26, 1988), for its holding that even the state interest identified in *Buchanan* can easily be satisfied by "impanel[ing] a separate non-death-qualified jury to try the non-capital defendants simultaneously with the death-qualified jury that tries the capital defendants." *Id.*, 26 F.3d at 410 n. 4. Therefore, Judge Cowen would have granted the petition on the basis of the death qualified jury issue.

The majority noted that "we do not believe the dissent's analysis and conclusion to be free from doubt." *Id.* at 407 n. 12. After review of the relevant Supreme Court cases and consideration of the facts of this case it appears that Petitioner's trial before a death qualified jury did not violate the Sixth and Fourteenth Amendments. First, although the Pennsylvania Supreme Court eventually concluded that the new death penalty statute could not be applied to Petitioner, it did so by the very narrowest of margins, a 4–3 decision. Retroactivity is far from an easy issue, *see, e.g., Centre Beverage Co. v. Miller Brewing Co.*, 779 F.2d 168 (3d Cir.1985) (describing the difficulty of determining whether an amendment to Pennsylvania's liquor code was to be applied retroactively), and it would

not be appropriate for a federal court, with the aid of hindsight, to conclude that in 1979, Judge Ross committed constitutional error in failing to predict as "clear" an issue of Pennsylvania law that the Pennsylvania Supreme Court finally resolved two years later by a bare majority of one.[11]

Second, although neither *McCree* nor *Buchanan* was a unanimous decision, the dissents in both cases were authored by Justice Marshall and joined by Justices Brennan and Stevens. Justice Stevens remains on the Court, but Justices Marshall and Brennan have retired and there is no indication that those dissents are likely to attain majority status. Indeed, Justice Thomas (Justice Marshall's successor) joined Justice Scalia's dissent in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 156, 114 S.Ct. 1419, 1436, 128 L.Ed.2d 89 (1994), rejecting the conclusion of the majority that the equal protection clause prohibits discrimination in jury selection on the basis of gender. Judge Cowen cites *J.E.B.* as a recent case in which "[t]he conviction-proneness of certain jurors disturbs many a jurist." 26 F.3d at 411. However, the Supreme Court's decision in *J.E.B.* does not rely on the conviction proneness of certain jurors, but upon the impropriety of excluding any potential juror based upon membership in a group. As the Court articulated in *McCree* and *Buchanan*, the exclusion of jurors who express an inability to follow the law because of their positions on the death penalty is not improper and does not present an appearance of unfairness.

Moreover, although the facts in this case differ from those in *McCree* and *Buchanan*, the rationale that led to those decisions may be applied here as well. In *Buchanan*, the trial court knew that Buchanan was not eligible for the death penalty, yet the Supreme Court allowed the death qualification of the jury because of the state interest in trying co-defendants together. In this case, the trial court had a good faith belief that Petitioner would be subject to the newly enacted

---

11. Indeed, the majority was very narrow: three justices were in favor of affirming the sentence and three justices concluded that the due process and equal protection clauses were violated and that the statute should not be applied retroactively to Petitioner. Justice Nix supplied the final

vote in favor of setting aside the death sentence, but "[t]he sole basis for my conclusion is that the Legislature expressed no intention to apply [the new Act] to an offense which occurred in 1974." *Id.*, 440 A.2d at 493.

death penalty statute, and thus at that time he appeared to be in the same position as the defendant in *McCree*. Judge Cowen's conclusion that Pennsylvania had no interest in death qualifying Petitioner's jury in 1979 (when the case resembled *McCree* ) is based upon the resolution of a retroactivity question not reached until 1981 (when the facts suggested *Buchanan* without the co-defendant). There is no authority for the proposition that hindsight permits the conclusion that the state interest that existed in 1979 was abrogated by the finding of the Pennsylvania Supreme Court two years later.

More significantly, Judge Cowen's dissent accepts as true a conclusion that the petitioners in *McCree* and *Buchanan,* as well as Petitioner herein, have never proved: that the social science studies in fact demonstrate that death-qualified juries are more prone to convict. As noted above, the Supreme Court in *McCree* would have rejected nine of the fifteen studies submitted by McCree as irrelevant, would have adopted its holding in *Witherspoon* rejecting an additional three studies as too tentative and fragmentary to make out a claim of constitutional error, and would have concluded that the remaining three did not provide substantial support for the per se constitutional rule McCree advocated. 476 U.S. at 168–73, 106 S.Ct. at 1762–65. The Court assumed for the purposes of the case that the studies demonstrated that death qualification in fact produces juries that are somewhat more conviction prone than non-death qualified juries because, *even so,* McCree still failed to demonstrate a fair cross section constitutional claim. There is a significant difference between accepting the social science studies as proof of jury bias for the sake of argument in order to reach a constitutional issue that a petitioner would

nevertheless fail to demonstrate, and accepting the studies and then using the distinctions between this case and *McCree* to conclude that Petitioner has established his claim. Petitioner never submitted any studies to the state courts [12] and only now proposes to submit to this Court various studies which duplicate those submitted in *McCree.* See the opinion and order denying Petitioner's Motion to Reconsider His Request for an Evidentiary Hearing. As Justice Larsen [13] observed in his opinion:

> it would be extremely inappropriate for this Court to decide the *"Witherspoon*-prosecution/proneness" argument on the basis of the data discussed in [Petitioner's] brief. By failing to introduce evidence to the lower court, [Petitioner] has deprived the Commonwealth of an opportunity to raise methodological criticisms to the studies and surveys and to present its own data by way of conflicting studies and expert witnesses. The fact that a record was made on the subject in California is no justification for the failure to make a record in the proceedings herein.

440 A.2d at 496.[14]

Finally, Judge Cowen must have concluded (although his dissent does not discuss the issue) that Petitioner has demonstrated that his particular jury was non-neutral, a conclusion rejected by the Pennsylvania Supreme Court. Justice Larsen examined Petitioner's particular jury in response to Petitioner's reliance on *Hovey v. Superior Court of Alameda County,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980), a case in which "the California Supreme Court did conclude, after painstaking analysis, that a *Witherspoon-*'death-qualified' jury was not neutral as regards guilt or innocence, [but] neverthe-

---

**12.** Instead, Petitioner merely cited a case from the Supreme Court of California and several post-*Witherspoon* studies and argued that the Pennsylvania Supreme Court should take "judicial notice" of them. The court declined to do this. 440 A.2d at 496.

**13.** As noted above, Justice Larsen (who, along with Justices Flaherty and Kauffman, dissented from the majority opinion only insofar as it determined that the newly enacted death penalty statute should not apply to Petitioner), wrote an alternative opinion of the court that explained in

detail why the court found all of Petitioner's claims meritless. Therefore, the Court will examine Justice Larsen's opinion as it reveals the thought processes of the entire court on this issue.

**14.** Respondents note that, if the issue had been explored in state court, they were prepared to submit articles demonstrating either that death-qualified juries are not more prone to convict or that Petitioner's studies are seriously flawed. (Answer to Am. Pet. at 55 n. 20.)

less rejected the petitioner's argument that his own jury had been shown to be 'prosecution-prone'." *Id.*, 440 A.2d at 497. Although the post-*Witherspoon* studies submitted in *Hovey* identified five categories in the available jury pool, one of which (the group which would never impose the death penalty given the choice) was excluded from the jury, the court in *Hovey* concluded that California's procedure also excluded a second group, those jurors who would automatically impose the death penalty if given the choice (the A.D.P.s). Therefore, the California Supreme Court concluded that the defendant had failed to demonstrate that California's procedure produced non-neutral juries in capital cases. *See also Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (death qualification voir dire that removes A.D.P.s as well as veniremen who would automatically vote for life imprisonment when the option was available does not produce a non-neutral jury).

Justice Larsen noted that:

> In the instant case, review of the record of the selection of jurors from the venire reveals that, as in the *Hovey* case, no juror was selected from the group which would automatically *impose* the death penalty. Accordingly, whatever conclusions the California Supreme Court might have reached from the post-*Witherspoon* data it studied, those conclusions are similarly of insufficient relevance when considering a jury such as the one chosen in [Petitioner's] case.

440 A.2d at 497. Justice Larsen explained that "[o]f the 12 jurors selected, six were in the 'neutral' or 'indifferent' category (jurors nos. 19, 20, 27, 44, 63 and 76), one was in the 'favor death penalty' group (juror no. 39), and five were in the 'oppose death penalty' group (jurors nos. 3, 23, 34, 41 and 67)." *Id.* at 497 n. 10. The following summary contains the jury's responses to the death penalty issue raised during voir dire.

Mildred Wolfendale (Juror # 3) expressed general "reservations" about the death penalty. (TT Vol. II at 399). However, she indicated no conscientious scruples in imposing the death penalty if a guilty verdict was established. (TT Vol. II at 400). Further, she indicated that life imprisonment was a proper alternative to the death penalty in a first degree murder conviction. (TT Vol. II at 401).

Joann Etter (Juror # 19) expressed neither conscientious scruples nor a fixed belief against the death penalty. (TT Vol. II at 525.) She was indifferent to the imposition of the death penalty, indicating a need to hear the facts of the case before determining the proper sentence. (TT Vol. II at 525.)

Adam Bock (Juror # 20) expressed neither moral or religious scruples against the death penalty. (TT Vol. II at 532.) Further, he understood that life imprisonment was a proper alternative to the death penalty in a first degree murder conviction. (TT Vol. II at 532–33.)

Arthur McElhinney (Juror # 23) expressed general opposition to the death penalty. (TT Vol. II at 574.) However, he would vote for the death penalty, along with his fellow jurors, if the facts of the case warranted the imposition of the death penalty. (TT Vol. II at 575–76.) Further, he indicated that life imprisonment was a proper alternative to the death penalty in a first degree murder conviction. (TT Vol. II at 576–77.)

Marie Gray (Juror # 27) expressed neither conscientious scruples nor a fixed belief against the death penalty. (TT Vol. II at 618.) Further, she indicated that life imprisonment was a proper alternative to the death penalty in a first degree murder conviction. (TT Vol. II at 619.)

Edna Downing (Juror # 34) expressed general opposition to the death penalty. (TT Vol. II at 668, 672.) However, she modified this position by indicating that in the proper case, after hearing evidence, she could impose the death penalty. (TT Vol. II at 673.)

Lenora Tumsis (Juror # 39) stated she was in favor of the death penalty. (TT Vol. II at 713.) However, she understood that the law required certain factors to be met before imposing the death penalty. (TT Vol. II at 715–16.) Hence, she acknowledged that a first degree murder conviction would not automatically compel her to vote for the death penalty. (TT Vol. II at 716.)

Russell Bernardo (Juror # 41) expressed a general religious opposition to the death penalty. (TT Vol. II at 729.) However, his general opposition to the death penalty could be influenced by the evidence at trial. (TT Vol. II at 737.) Hence, in the proper case, he would impose the death penalty. (TT Vol. II at 737.)

Eva Mansfield (Juror # 44) expressed neither conscientious scruples nor a fixed belief against the death penalty. (TT Vol. III at 771.) Further, she indicated that life imprisonment was a proper alternative to a first degree murder conviction. (TT Vol. III at 772–73.)

Natalie Damico (Juror # 63) expressed neither conscientious scruples nor a fixed belief against the death penalty. (TT Vol. III at 904.) Further, she indicated that the defendant must be found guilty beyond a reasonable doubt in order to impose either life imprisonment or the death penalty. (TT Vol. III at 905.)

Charles Mowry (Juror # 67) expressed general hesitation concerning the death penalty. (TT Vol. III at 937–38.) However, he stated no religious or moral scruples against imposing the death penalty. (TT Vol. III at 937.) Yet, he indicated in the proper case, he could impose the death penalty. (TT Vol. III at 943–44.)

Jennie Knox (Juror # 76) expressed neither conscientious scruples nor a fixed belief against the death penalty. (TT Vol. III at 1007.) Further, she indicated that in order to impose the death penalty, a defendant must be found guilty beyond a reasonable doubt. (TT Vol. III at 1009.)

As Justice Larsen concluded, the jury consisted of six individuals neutral or indifferent to the death penalty, one in favor of it and five in the oppose death penalty category. The jury contained no individuals who would automatically vote to impose life imprisonment under any circumstance, but neither did it contain any A.D.P.s. The finding of the Pennsylvania Supreme Court that Petitioner's jury was not impartial may well be sub-

ject to the presumption of correctness under *Witt.*[15] Moreover, even without the presumption of correctness, Petitioner has not demonstrated how the death qualification of his jury, even if unnecessary as examined in hindsight, denied him a fair trial given the makeup of the jury.

In summary, Petitioner's claim that the Commonwealth lacked an interest in death qualifying his jury assumes that the fact that the retroactivity issue was finally resolved in Petitioner's favor in 1981 by a 4–3 vote of the Pennsylvania Supreme Court means that it was "clear" in 1979 that Petitioner could not be subjected to the newly enacted death penalty statute, a finding this Court cannot make. Moreover, the Court cannot assume that the social science studies that Petitioner never submitted to the state courts would demonstrate that the process of death qualification results in juries that are more conviction prone, particularly given the holdings of the Supreme Court in *McCree* and *Buchanan.* Finally, even if the process of death qualification in general can produce juries that are more conviction prone, the Court cannot assume that Petitioner was tried by a non-neutral jury when: 1) Petitioner did not develop a record in the state courts to substantiate this claim; 2) the Pennsylvania Supreme Court specifically found that Petitioner's jury was impartial, a factual finding that may be entitled to a presumption of correctness in this proceeding; and 3) this Court's own review of the entire record reveals no evidence that Petitioner's jury was biased in favor of the death penalty or in favor of conviction. Therefore, as to this issue, the petition should be denied.

*The Trial*

As to the remaining issues it is necessary to consider the evidence presented at trial.

On October 22, 1979, the Commonwealth's case was presented against defendant Stanton Story, for the alleged murder of Pittsburgh Police Officer, Patrick Wallace.

---

**15.** When Petitioner again raised this issue in his PCHA petition, Judge Ross held that it "was addressed by the Supreme Court, *Commonwealth v. Story, id.,* and rejected. Thus, this issue has

been finally litigated." (Answer Ex. 24 at 3–4.) The Superior Court agreed. (Answer Ex. 30 at 3.)

Officer Kenneth J. Scanlon testified to the events that led up to the murder of his partner, Officer Wallace on the morning of July 3, 1974. While on patrol of the Homewood–Brushton area, the officers observed Lafayette Jones, who was wanted on a warrant, walking on Fargo Street. (TT Vol. IV at 1112, 1118.) Upon circling the block to arrest Jones, Officer Scanlon testified that at a narrow section on Fargo Street, he waived through a grey cadillac with two black male occupants inside. (TT Vol. IV at 1119–20.)

Proceeding down Fargo Street the patrol car again passed the grey cadillac parked with a black female conversing with the occupants. (TT Vol. IV at 1121–22.) Officer Scanlon testified that although the passenger turned his face to conceal his identity, the driver looked directly at him. (TT Vol. IV at 1122–23.) According to Officer Scanlon, he mentioned to Officer Wallace that he knew this man and knew he was wanted. (TT Vol. IV at 1123.) However, the officers did not stop because they only had an arrest warrant for Jones. (TT Vol. IV at 1123.)

The patrol car proceeded down Fargo Street and turned down Singer Place where the officers stopped and arrested Jones. (TT Vol. IV at 1124–25.) According to Officer Scanlon, Jones had a braided hairstyle at the time of the arrest. (TT Vol. IV at 1126.) However, the officers experienced difficulty in placing Jones in custody because the left rear door of the patrol car was jammed shut. (TT Vol. IV at 1127.) Once again, Officer Scanlon noticed the grey cadillac, this time paused at the intersection of Fargo Street and Singer Place with both occupants looking down in their direction. (TT Vol. IV at 1127.) Subsequently, the grey cadillac made a left hand turn on Singer Place and drove away from the officers. (TT Vol. IV at 1128.)

When the officers next attempted to place Jones in to the patrol car through the right rear door, Jones broke free from Officer Scanlon and ran up Singer Place. (TT Vol. IV at 1128.) Both officers pursued Jones up Singer Place, with Officer Wallace in the lead. (TT Vol. IV at 1130.) Suddenly, Officer Scanlon heard someone shout "Don't come any closer" and immediately shots were fired at the officers from behind a green Volkswagen. (TT Vol. IV at 1132.) Officer Scanlon testified that he returned fire against the shooter, whom he identified as Stanton Story, the driver of the grey cadillac. (TT Vol. IV at 1134–36.) Both Jones and Story escaped arrest.

Officer Scanlon discovered that Officer Wallace was mortally wounded and promptly called for an ambulance, accompanying it to Columbia Hospital. (TT Vol. IV at 1138, 1140.) While at the hospital Officer Scanlon gave an initial interview with Homicide Detective Joseph Stotlemyer concerning the physical description of the shooter. (TT Vol. IV at 1141–42.) Further, Officer Scanlon testified that he informed Detective Stotlemyer that he knew the identity of the shooter and knew he was wanted. (TT Vol. IV at 1142.)

After the initial interview, Officer Scanlon while en route from the hospital to the Public Safety Building recalled the name of the shooter, when a police radio broadcast identified Stanton Story as a known associate of Lafayette Jones. (TT Vol. IV at 1142–43.)

On cross examination, Officer Scanlon testified that when they passed the grey cadillac the second time, both occupants had platted, or braided hairstyles. (TT Vol. IV at 1168.) On redirect examination Officer Scanlon testified that he had seen Story perhaps two, three, or four times prior to the shooting. (TT Vol. IV at 1187–88.)

Detective Robert Miller, an evidence technician for the mobile crime unit, testified to the flight path of a bullet that penetrated a parked car. (TT Vol. IV at 1191–95.) However on cross examination, Detective Miller admitted to taking only a visual measurement with the aide of a pencil to determine the flight path of the bullet. (TT Vol. IV at 1200.) No fingerprints were found on the car. (TT Vol. IV at 1198.)

Peter Marone, Chief Criminalist of the Allegheny County Crime Laboratory, testified to the differences between automatic and revolver firearms, automatic and revolver ammunition, and the copper colored residue found on the hole in officer Wallace's sternum. (TT Vol. IV at 1202, 1207–26.)

Herman Stamps testified that while trimming the hedges of his residence on 709 Singer Place, he heard a pop and saw a grey cadillac with two black male occupants accelerate past him. (TT Vol. IV at 1258–61.) However on cross examination he testified that he knew the difference between an afro hairstyle and braided hairstyle, and the passenger of the grey cadillac had an afro hairstyle. (TT Vol. IV at 1268–69.)

Detective Joseph Stotlemyer testified from a report he prepared when he took notes during the interview with Officer Scanlon at Columbia Hospital. (TT Vol. IV at 1275–76.) According to Detective Stotlemyer, Officer Scanlon stated that the shooter had braided hair and that although he could not remember his name, he had seen him before. (TT Vol. IV at 1276–77.) Further, Officer Scanlon informed Detective Stotlemyer that he recognized the shooter as the driver of the grey cadillac. (TT Vol. IV at 1281.) Detective Stotlemyer also testified that he participated in processing the crime scene which included taking measurements, taking interviews, and collecting evidence. (TT Vol. IV at 1288.)

On cross examination, Detective Stotlemyer admitted destroying the original notes taken from the interview he conducted with Officer Scanlon at Columbia Hospital. (TT Vol. IV at 1321–22, 1327.) Similarly, Officer Ronald B. Freeman testified that after interviewing Officer Scanlon at the Public Safety Building, he wrote a report and destroyed his original notes. (TT Vol. IV at 1387.)

James B. Brown, who is related to Story by marriage, testified that sometime between 9:00 and 10:00 on the morning of July 3, 1974, he saw Story working on his grey cadillac across the street from Mr. Brown's home. (TT Vol. IV at 1411–12, 1414.) On cross examination, Mr. Brown testified that, at that time, Stanton Story had an afro hairstyle and was wearing short pants and a jersey. (TT Vol. IV at 1415.)

William Bebler testified that when he was a homicide detective for the Tampa Police Department, he recovered a grey cadillac parked at 124 East Broad Street, Tampa

Florida in September 1974. (TT Vol. IV at 1417–18.)

Officer Robert W. McKay testified to the unavailability of two witnesses, Alene Smith and Nadine Brown. These two witnesses had resided at 124 East Broad Street, Tampa Florida, and had previously testified at Story's first criminal trial. Officer McKay testified that he contacted both the Tampa Police Department and the Daytona Police Department but was unable to locate the witnesses because they had left no forwarding address. (TT Vol. IV at 1431–34.)

Attorney Schwartz, in chambers, objected to the absent witness testimony asserting that the Commonwealth did not make a good faith attempt to locate the witnesses. According to Attorney Schwartz, Officer McKay did not send a registered letter, did not send a subpoena, and did not personally attempt to locate the witnesses. (TT Vol. IV at 1463.) The Court overruled Attorney Schwartz's objection "under the authority of Section 5917 of the Act of May 23, 1877, 19 Purdon Statute 582." (TT Vol. IV at 1467.) [16]

Further, Attorney Schwartz objected to the absent witness testimony because it included prejudicial evidence—the names of three black revolutionaries, Malet, Karmu and Makif. (TT Vol. IV at 1468.) However, the Court overruled the objection because the names were relevant to the issue of flight. (TT Vol. IV at 1468.) Subsequently, the Court permitted certain portions of the testimony of Alene Smith and Nadine Brown to be read into evidence.

Alene Smith had testified that she was traveling from her mother's house in Daytona, Florida to Tampa on July 7, 1974 when she met Stanton Story, Robert Davis and Lafayette Jones, on the bus. (TT Vol. IV at 1482–83.) At the time, Story introduced himself as Makif, while Davis introduced himself as Karmu and Jones introduced himself as Malet. (TT Vol. IV at 1484.) She learned their real names when the FBI showed her photos of the men in August 1974. (TT Vol. IV at 1485.) The three men stopped in Smith's house in Tampa approxi-

---

**16.** The substance of former 19 P.S. § 582, concerning the use of testimony of unavailable witnesses, is now contained in 42 Pa.C.S. § 5917 (1978).

mately every day during July 1974, although they lived at another location in Tampa and only occasionally spent the night at Smith's house. (TT Vol. IV. at 1486–87.) Story owned a grey cadillac that Smith had ridden in twice. (TT Vol. IV at 1487–88.) He had retrieved this car from a town in North Carolina approximately one week after he arrived on the bus with Smith. (TT Vol. IV at 1491.) When Story left town at the end of July 1974, he told Smith that he would give her the car, but he never sent the papers. (TT Vol. IV at 1490.)

On cross examination, Smith had testified that all three men had their hair in braids when she first met them. (TT Vol. IV at 1494.) Nadine Brown, Smith's daughter, had testified that she knew Story as Makif when she met him with her mother shortly after July 4, 1974. (TT Vol. IV at 1499–1500.) She also identified the grey cadillac as Story's. (TT Vol. IV at 1501.) The following exchange took place between the Commonwealth and the witness:

A. He told me that he was in trouble.

Q. In trouble?

A. Yeah. In big trouble.

Q. In big trouble. Did he say where?

A. He said up North.

(TT Vol. IV at 1503.)

Detective John Swearingen testified that both he and Detective Stotlemyer arrested Story on September 9, 1974.[17] (TT Vol. IV at 1515–16.) Prior to being taken into custody, Story was read his *Miranda* rights and acknowledged that he understood them. (TT Vol. IV at 1520.) During the ride to the Public Safety Building, Story recounted the events that took place on July 3, 1974. (TT Vol. IV at 1521.) According to Story, both he and Robert Davis witnessed the arrest of Jones, whereupon Davis stated, "We got to help the brother" and Story replied, "Okay, come on. Let's get it on." (TT Vol. IV at 1522–23.) Story also admitted that he yelled "Don't come any closer" to the officers and that both he and Davis fired at the officers. (TT Vol. IV at 1523.) Subsequently, the three actors, Jones, Davis and Story, escaped via the turnpike to Charlotte, North Carolina. (TT Vol. IV at 1523–24.)

On cross examination, Detective Swearingen admitted that Story's statement in the car was inconsistent with statements he made earlier and later that day that only Robert Davis was the shooter. (TT Vol. IV at 1532, 1538.) Further, Detective Swearingen admitted that he had not taken notes while Story was recounting his version of the incident. (TT Vol. IV at 1532.) Scott Gray, who worked at his father's car distributorship, testified that he sold a 1967 grey cadillac to a "Robert Story" in June 1994. (TT Vol. IV at 1553–55.) Later, Detective Stotlemyer on recall linked this purchase by Social Security number to Stanton Story. (TT Vol. V at 1610–11.) Story admitted that it was his car and that he had forged his brother's signature on the bill of sale. (TT Vol. V at 1622–23, 1644.)

Detective Stotlemyer, on recall, testified that he stopped the car to investigate an accident on Washington Boulevard and that in the process he took notes concerning Story's account of the incident. (TT Vol. IV at 1568.) Based on the report prepared using those notes Detective Stotlemyer testified that Story had admitted that both he and Davis had fired at the pursuing officers. (TT Vol. IV at 1569–73.) Further, Officer Stotlemyer testified that he did not retain his original notes after they were incorporated into his report. (TT Vol. IV at 1570.)

Lafayette Jones, outside the presence of the jury, asserted his Fifth Amendment right and refused to testify. (TT Vol. V at 1605.) Consequently, the Court held Jones in contempt of court, holding he did not have a Fifth Amendment privilege. (TT Vol. V at 1605–07.)

The Commonwealth rested and the defense called Stanton Story. Story testified that Davis was driving Story's grey cadillac when they stopped on Fargo Street to talk to Jones' girlfriend, Sandy Sommers. (TT Vol. V at 1625–26.) Further, Story testified that

---

**17.** The prosecutor supplied the date of September 9, 1974. (TT Vol. IV at 1515.) When Detective Stotlemyer was recalled to the stand, he clarified that Story was arrested on September 7, 1974. (TT Vol. IV at 1565.)

Davis parked the car at the corner of Sickles and Singer Place in order to investigate Jones' arrest. (TT Vol. V at 1628–29.) According to Story, he did not want to interfere with the arrest because he was already wanted by the police because he had not returned from a furlough for over a month. (TT Vol. V at 1627–28.)

Next, Story testified that Davis, who was armed (while Story alleges that he was not), took the keys from the ignition and walked up the hill toward the arresting officers. (TT Vol. V at 1629–30.) After exiting from the passenger door, Story saw Jones in handcuffs running past him and heard several shots. (TT Vol. V at 1630.) Upon reentering the car, Story testified that Jones got in to the back seat because the car doors were open. (TT Vol. V at 1631–32.) Further, Story testified that he saw Davis standing behind a parked Volkswagen and heard two or three shots fired. (TT Vol. V at 1632.) Subsequently, Davis drove the three via the turnpike to Charlotte, North Carolina. (TT Vol. V at 1632.)

Story, Davis and Jones stayed in Charlotte for four days before taking a bus to St. Petersburg, Florida in search of Jones' relatives. When they could not find these relatives in St. Petersburg, they took the bus to Tampa. (TT Vol. V at 1634.) Story admitted meeting Alene Smith and Nadine Brown on the bus and in Tampa, introducing himself as Makif and hearing Davis and Jones introduce themselves as Karmu and Malet. (TT Vol. V at 1634–35.) Approximately a month later, Story returned to Pittsburgh, after which he was soon arrested. (TT Vol. V at 1635.)

Stanton Story testified that he left the scene of the shooting because he was afraid of being accused of committing the shooting, in addition to being "on the run from the penitentiary." (TT Vol. V at 1632.) Further, Story testified that when he was arrested by Detectives Stotlemyer and Swearingen he maintained his innocence, claiming Davis was the shooter. (TT Vol. V at 1636–37.) However, Story admitted that he committed perjury at his first trial, when he claimed to have been in Charlotte, North Carolina at

the time of the shooting. (TT Vol. V at 1639.) Story testified that at the time of the incident his hair was not braided but in an afro, unlike Davis, whose hair was braided. (TT Vol. V at 1641–42.) While in Florida, Story kept his hair both ways, but primarily in an afro. (TT Vol. V at 1642.)

On cross examination, Story admitted to forging his brother's name on the bill of sale for the grey cadillac because he was "on the run from the penitentiary." (TT Vol. V at 1644.) Further, Story admitted that he did not know how a handcuffed Jones could enter his car when both back seat doors were closed as indicated in a photograph. (TT Vol. V at 1645–46.) In addition, Story admitted that he did not give up voluntarily on the day he was arrested. (TT Vol. V at 1657.) Furthermore, Story admitted that witnesses from North Carolina at his first trial corroborated his perjured testimony regarding his whereabouts on the day of the shooting. (TT Vol. V at 1658.)

The defense called Niccole Horton, a licensed cosmetologist, who testified that in her opinion it would take about an hour to braid hair the length Story had at the time, and longer if a man tried to braid his own hair. (TT Vol. V at 1664, 1669.) However, on cross examination, she admitted that there are many variables involved in braiding hair, such as texture, and that she had never observed a man braiding his own hair, so she could not testify as to how long it would take. (TT Vol. V at 1670.) The defense rested. (TT Vol. V at 1671.)

On October 26, 1979 the jury found Stanton Story guilty of first degree murder and, pursuant to a sentencing hearing conducted that afternoon, imposed the death penalty that same day. (TT Vol. V at 1827, 1902.) [18]

*Ineffective Assistance of Counsel Because of Performance*

When a habeas petitioner claims ineffective assistance of counsel based on deficient performance by trial counsel, he must show that: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) the deficient performance

18. Judge Ross pronounced sentence at a short sentencing hearing on July 21, 1980.

prejudiced him. To satisfy the first prong, the petitioner must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (quoting *Michel v. State of Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). To satisfy the second prong, he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. In addition, although petitioner must satisfy both prongs to succeed on his ineffectiveness claim, the Court noted that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. at 2069. A state court's conclusion that counsel was not ineffective is a mixed question of law and fact not entitled to a presumption of correctness, but "the specific historical facts found by a state court in the course of deciding an ineffectiveness claim are subject to deference by § 2254(d) unless they are not supported by the record." *Deputy v. Taylor*, 19 F.3d 1485, 1494–95 (3d Cir.), *cert. denied*, 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994).[19]

### *Failure to Interview Witnesses*

■ Petitioner asserts that trial counsel was ineffective for failing to investigate and interview various witnesses. Counsel's failure to conduct investigation can constitute ineffectiveness, but, following the Supreme Court's direction in *Strickland*, the Court will first examine whether Petitioner can demonstrate that counsel's actions, assuming they fell below an objective standard of reasonableness, caused actual prejudice to him at trial. Given the volume of evidence presented against Petitioner at trial, Petitioner

has not demonstrated how counsel's alleged errors, even if accepted as true, caused him actual prejudice. The following is a summary of the trial evidence presented by the Commonwealth against Petitioner.

1). Officer Scanlon, partner of the deceased, identified Stanton Story as the shooter who killed Officer Wallace. (TT Vol. IV at 1135–36.)

2). Officer Scanlon testified he knew Story and had seen him approximately two, three, or four times prior to the shooting. (TT Vol. IV at 1887–88.)

3). Herman Stamps testified he heard a pop and saw a grey cadillac with two black male occupants accelerate past him. (TT Vol. IV at 1258–61.)

4). James B. Brown testified that on the morning of July 3, 1974, Story was working on his grey cadillac in front of Mr. Brown's home. (TT Vol. IV at 1411–12.)

5). William Bebler testified that he found a grey cadillac parked at 124 East Broad Street, Tampa, Florida. (TT Vol. IV at 1418.)

6). Excerpts of Alene Smith's testimony, from Story's prior criminal trial, were read into evidence. She testified that her residence on July 7, 1974, was 124 East Broad Street, Tampa, Florida. (TT Vol. IV at 1482.) Further, she testified that Story referred to himself under the alias, "Makif." (TT Vol. IV at 1483–84.) In addition, she testified that Story was driving a grey cadillac. (TT Vol. IV at 1487–88.)

7). Excerpts of Nadine Brown's testimony, from Story's prior criminal trial, were read into evidence. She testified, like her mother Alene Smith, that Story had used the alias "Makif." (TT Vol. IV at 1499.) Further, she testified Story admitted that he was in big trouble up North. (TT Vol. IV at 1503.)

8). Detective John Swearingen, one of the arresting officers testified that Story was given his *Miranda* rights and indicated that he understood these rights. (TT Vol. IV at

---

**19.** Section 104(2) of the AEDPA redesignated former section 2254(d) as new section 2254(e), and section 104(4) amends the contents of new section 2254(e).

1520.) Story stated that after Davis said "We got to help the brother", referring to the arrest of Jones, Story replied, "Let's get it on." (TT Vol. IV at 1522–23.) Further, Story admitted after yelling to the officers, "Don't come any closer" that both he and Davis fired at the officers. (TT Vol. IV at 1523.)

9). Detective Joseph Stotlemyer, an arresting officer, corroborated the testimony of Detective Swearingen by testifying that Story admitted that both he and Davis fired their guns at the officers. (TT Vol. IV at 1573.)

Thus, even if Petitioner demonstrated that Attorney Schwartz was ineffective for failing to interview the witnesses he identifies, he has failed to demonstrate a reasonable probability that he would not have been convicted if these witnesses had been interviewed and/or had testified. In addition, the Court concludes that Petitioner has failed to demonstrate that trial counsel's actions fell below an objectively reasonable level of performance.

Attorney Schwartz testified at the PCHA hearing concerning Petitioner's allegations that he failed to interview certain witnesses in preparation of trial as follows:

Attorney Schwartz had a "vague recollection" of interviewing Robert Davis, but chose not call him as a witness because "we were under the impression that he had no intention of cooperating and would not have admitted that he had done the shooting...." (PCHA Hr'g, Answer Ex. 22, at 5.) [20]

Lafayette Jones was not interviewed nor did he testify as a witness because he "ultimately pled the Fifth and we were under the impression that he would not cooperate with us because he wasn't going to cooperate with the Court." (Id. at 6.) [21]

Attorney Schwartz testified that he could not remember whether or not he had interviewed "Jim–Jim" Davis. (Id. at 9.) However on cross examination, Attorney Schwartz was referred to the previous trial transcript in which "Jim–Jim" Davis "indicated that he was not present, did not see Stanton Story that day of the shooting...." (Id. at 11.) Consequently, Attorney Schwartz admitted that if "Jim–Jim" Davis had testified he would have been subject to both impeachment and charges of perjury. (Id. at 12.) [22]

Attorney Schwartz had a "vague recollection" of meeting S.T. Story. (Id. at 13.) The Commonwealth questioned the need for S.T. Story's testimony because it was cumulative in that "the prosecution had a witness, Stanton Story's uncle, that would have testified [to] the exact same thing?" (Id. at 14.) Although Attorney Schwartz did not recall this witness testifying at the first trial, he did agree that S.T. Story's testimony would not be necessary because "if it was cumulative, then the fact had already been testified about." (Id. at 15.) [23]

Sandy Sommers was never interviewed because: "we had no way of knowing who she was or where she could be located." (Id. at

---

**20.** At trial, the prosecution stated in chambers that it would not call Davis, who was incarcerated in New Jersey for three life sentences, because he had indicated through his public defender that, if called, he would plead the Fifth Amendment and refuse to testify. (TT Vol. IV at 1459.) Petitioner's counsel in these proceedings, Attorney Bartko, has submitted the affidavit of Attorney Schwartz, in which he indicates that he cannot recall interviewing Davis. (Am.Pet.Ex. B.) Moreover, Attorney Bartko has submitted the affidavit of an investigator that he has been unable to locate the Robert Davis involved in this case. (Am.Pet.Ex. A.)

**21.** Attorney Schwartz now states in an affidavit that he cannot recall interviewing Lafayette Jones. (Am.Pet.Ex. B.) Attorney Bartko's investigator found Jones, who now claims that he did

not see Story the day of the crime, that he does not remember being interviewed by Attorney Schwartz, that he does not recall Story's hairstyle on July 3, 1974 and that he does not know where his family members are now living. (Am. Pet.Ex. A.)

**22.** At Petitioner's first trial in 1975, James "Jim–Jim" Davis testified that he did not see Stanton Story on July 3, 1974. (TT First Trial Vol. IV at 2669.) Attorney Bartko's investigator has been unable to locate "Jim–Jim" Davis. (Am.Pet.Ex. A.)

**23.** Attorney Schwartz now states in an affidavit that he cannot recall interviewing S.T. Story. (Am.Pet.Ex. B.) S.T. Story died on April 19, 1980. (Am.Pet.Ex. C.)

6.) [24]

George Jones, Lafayette Jones' brother, was not called by Attorney Schwartz because he had testified at the first trial "that he was not in the Pittsburgh area at the time that the shooting occurred." (*Id.* at 13.) [25]

Attorney Schwartz testified that he received discovery in the case, which included police reports and the prior trial transcript. (*Id.* at 10.) Furthermore, he explained that he did not hire an investigator "because of the financial situation and at that time two young attorneys volunteered and helped me in the case and actually did the footwork with me going to the scene, interviewing all possible witnesses around the scene ... and at the time the three of us did the legwork because there was no money there to be paid." (*Id.* at 18–19.)

Judge Ross summarized the claim as presented at the PCHA hearing as follows:

> Petitioner's motion (Items 1–6) pled that he was denied effective assistance of counsel because trial counsel failed to interview Robert Davis, Lafayette Jones, Jim–Jim Davis, S.T. Story, Sandy Sommers and members of the Jones family. These witnesses, he claims, would have established that he was wearing an afro, not carrying a gun and was not the person who shot the victim.
>
> At the Evidentiary Hearing, the petitioner insisted on representing himself. His only witness was trial counsel, Charles Schwartz who testified regarding his knowledge of the above named persons, his investigation of them and his rationale for his decisions not to call them as witnesses. His reasons for not calling them as witnesses included conclusions that they would not be helpful to the petitioner or would be uncooperative based on their testimony at the petitioner's first trial, that their whereabouts were unknown, that their testimony would be cumulative and

that one witness refused to testify claiming his Fifth Amendment right not to incriminate himself. In summary, the petitioner failed to carry his burden that he was deprived of his right to effective assistance of counsel.

(Answer Ex. 24 at 3.) The Superior Court affirmed on the basis of Judge Ross' opinion. (Answer Ex. 30 at 3.)

As noted above, a state court's conclusion that counsel was not ineffective is a mixed question of law and fact not entitled to a presumption of correctness, but "the specific historical facts found by a state court in the course of deciding an ineffectiveness claim are subject to deference by § 2254(d) unless they are not supported by the record." *Deputy v. Taylor,* 19 F.3d 1485, 1494–95 (3d Cir.), *cert. denied,* 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994). The Court of Appeals has held that the presumption of correctness applies even to factual findings made by a state court after a federal court has determined that exhaustion should be excused. *Walker v. Vaughn,* 53 F.3d 609 (3d Cir.1995). *See Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Petitioner has not demonstrated why the historical facts found by the PCHA court, namely that Attorney Schwartz did attempt to find witnesses whose whereabouts remain unknown, that some of those he did not call would have presented cumulative testimony, that Lafayette Jones was called and refused to testify and that Robert Davis would have refused to testify if called, are not entitled to a presumption of correctness. Moreover, the only testimony that these individuals (other than Robert Davis and Lafayette Jones, the other two individuals involved in the shooting, who had refused to testify) could have presented was that Petitioner's hair was in an afro, and not platted, earlier that day. However, there are numerous gaps in Petitioner's argument.

---

24. Attorney Schwartz confirms in an affidavit that he has never been able to locate Sandy Sommers. (Am.Pet.Ex. B.) Attorney Bartko's investigator similarly has never been able to locate Sandy Sommers. (Am.Pet.Ex. A.)

25. At Petitioner's first trial, George Jones testified that he was in Virginia on his way to New Jersey on July 3, 1974 when he received a phone call informing him that his brother Lafayette was in trouble and that he met Story, Lafayette, and Robert Davis in Charlotte, North Carolina that evening. (TT First Trial Vol. V at 2971–77.)

First, "Jim–Jim" Davis had testified at the first trial that he had not seen Stanton Story that day and George Jones had testified that he did not see Story until much later that day in Charlotte, North Carolina, and he did not describe Story's hairstyle at that time. Thus, only S.T. Story and Sandy Sommers could have testified that Story had "an afro hairstyle" that morning. This statement was already made by James Brown at the trial (TT Vol. IV at 1415), and thus further testimony to this effect would have been cumulative. Yet, Petitioner's attempt to demonstrate that he did not have time to change his hairstyle before the shooting was unavailing. More significantly, Petitioner presented the testimony of Herman Stamps that he knew the difference between an afro hairstyle and a braided hairstyle, and that the passenger of the grey cadillac had an afro hairstyle at the time of the shooting. (TT Vol. IV at 1268–69.)

Secondly, however, Officer Scanlon's identification of Petitioner was not based on his hairstyle but on the fact that Scanlon recognized him from prior encounters and made the connection with his name when he heard it over the police radio. Contrary to the claim made in the Amended Petition, Scanlon did not testify that Petitioner was the passenger and that the driver (presumably Robert Davis) was the shooter. (Am. Pet. at 22.) Rather, he testified that Stanton Story was the driver and the shooter he recognized. (TT Vol. IV at 1133.) Scanlon said that the driver, the passenger and Lafayette Jones all had platted hair. (TT Vol. IV at 1124–26, 1168.) Thus, additional witnesses testifying to Story's hairstyle earlier that day would not necessarily have undermined Scanlon's identification of Story as the shooter.

Third, the evidence at trial indicated that two weapons were used, a revolver that was fired from behind the green Volkswagen (which fired the shot that actually killed Officer Wallace) and a .380 automatic that was fired from the right side. (TT Vol. IV at 1191–1200, 1211–18, 1224–25, 1231–33, 1299–1301, 1304–08, 1377–78, 1408–10.) In Petitioner's confession to Detectives Swearingen and Stotlemyer, he placed himself on the left side of the Volkswagen firing the automatic

weapon. (TT Vol. IV at 1523, 1573–74.) At trial, he testified that he was present but that only Davis had a gun. (TT Vol. V at 1605.) However, he also admitted that witnesses from North Carolina at his first trial corroborated his perjured testimony regarding his whereabouts on the day of the shooting. (TT Vol. V at 1658.)

Thus, the jury could have concluded that Petitioner was involved in the shooting based on his confession to Detectives Swearingen and Stotlemyer, based on Officer Scanlon's actual identification of him by recognition and name, or based on the version of events he presented at trial combined with evidence from the scene that two weapons were used and the fact that Petitioner had lied at the first trial. Petitioner has failed to demonstrate how the introduction of additional witnesses who would have testified to his hairstyle earlier that day would have made a difference. Cf. Berryman, 100 F.3d at 1097–1100 (trial counsel was ineffective when he failed to raise prior inconsistencies in victim's uncorroborated descriptions of assailants, opened the door to inquiry that one of the defendants was a subject in another criminal investigation and completely failed to investigate two witnesses who would have seriously eroded the victim's credibility with their testimony).

Petitioner has failed to demonstrate that Attorney Schwartz' performance fell below an objective standard of reasonableness so as to deny him effective assistance of counsel. In addition, Petitioner has failed to demonstrate a reasonable probability of a different result had these witnesses been interviewed and called to testify. Therefore, as to this issue, the petition should be denied.

*Resentencing by Pennsylvania Supreme Court*

■ Petitioner argues that the Pennsylvania Supreme Court should not have sentenced him to life imprisonment, but should have remanded the case to the trial court for resentencing. Petitioner's argument appears to be that this procedure would have guaranteed his right under Pennsylvania law to "allocution," that is, his "opportunity to make a statement in his own behalf and afford counsel for both parties to present argument

and information relative to sentencing." Pa. R.Crim. P. 1405(C). *See also* 42 Pa.C.S. § 9711(h)(4) ("If the Supreme Court determines that the death penalty must be vacated for ... reason[s other than the lack of support for aggravating circumstances], it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).") However, this language was added to § 9711 in 1988. The Pennsylvania Supreme Court had imposed the life sentence on December 28, 1981. Respondents argue that this is a state claim not cognizable in federal habeas corpus. A habeas petitioner's claims may be dismissed because they fail to present a federal constitutional issue, which places them outside the scope of habeas review, because "it is not the province of a federal habeas court to reexamine state questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges,* 423 U.S. 19, 21, 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975)). *See also Donnelly v. DeChristoforo,* 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Geschwendt v. Ryan,* 967 F.2d 877, 889 (3d Cir.) (en banc), *cert. denied,* 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 379 (1992).

The issue of whether the Pennsylvania Supreme Court should have remanded the case to the Court of Common Pleas or imposed the sentence of life imprisonment after it vacated Petitioner's death sentence is an issue of state law not cognizable in federal habeas corpus.[26] In addition, as Respondents argue, the state courts have held that the right to allocution is not retroactive. *Commonwealth v. Thomas,* 520 Pa. 206, 553 A.2d 918, 919 (1989). *See* Answer Ex. 30 at 3. Therefore, as to this issue, the petition should be denied.

### Other Issues

Respondents have not addressed Petitioner's other issues on the merits because they contend that he is procedurally defaulted from raising them. These issues are: counsel's failure to object when Detective Robert Miller was not asked about his expert credentials, when hearsay was given by Officers Stotlemyer and Freeman, when irrelevant testimony about the cadillac was given by William Bebler, when Alene Smith's and Nadine Brown's testimony was read into the record in violation of both the Confrontation Clause and the Due Process Clause because only parts were read, and when the testimony of these witnesses improperly presented a prejudicial hearsay admission that Petitioner was in the presence of two individuals involved in the shooting while he was in Florida; appellate counsel's failure to raise the issue of trial counsel's failure to object to Peter Marone acting as a gun expert, failure to raise trial counsel's failure to argue that testimony of witnesses had been improperly read into the record, failure to raise trial counsel's overruled objections to have stricken the testimony of Detective Swearingen who had taken handwritten notes and thrown them away prior to trial, and failure to raise all issues raised that were not raised by trial counsel.

### Detective Miller's Credentials

Detective Robert Miller, assigned to the mobile crime unit as an evidence technician, testified to the flight path of the bullet that struck the rear wind shield of a parked cadillac. Detective Miller indicated the bullet traveled "[i]n the direction of the left front of the auto." (TT Vol. IV at 1195.) The Court permitted this testimony stating, "I'm not sure it takes an expert to show that ... [Schwartz] can inquire as to how he arrived at that conclusion and what he based it on." (TT Vol. IV at 1196.)

On cross examination Detective Miller described his credentials that qualified him to determine the flight path of the bullet, "I have attended several schools locally and the North Hills, North Park Police Academy." (TT Vol. IV at 1198.) In addition, Detective Miller indicated that he attended the Police

---

**26.** Indeed, when Petitioner presented this issue in his PCHA petition, Judge Ross held that "petitioner claims that the Supreme Court improperly reduced his sentence from death to life imprison- ment in that his right of allocution was denied. This Court cannot review the decision of the Supreme Court." (Answer Ex. 24 at 4.)

Academy on various occasions, the last time being 1973 or 1974. (TT Vol. IV at 1198.) Furthermore, Detective Miller admitted to relying solely on a pencil and his eye to determine the flight path of the bullet. (TT Vol. IV at 1198.)

Thus, Attorney Schwartz did question Detective Miller's credentials and the methods he used and Petitioner has failed to support this claim. Therefore, as to this issue, the petition should be denied.

*Hearsay Testimony by Stotlemyer and Freeman*

Detective Stotlemyer testified from his report that Officer Scanlon identified the shooter as the driver of the grey cadillac and described him as a "colored male, dark skinned, round face, big eyes, noticeable. The subject is possibly clean shaven. He is wearing dark trousers and no shirt. He is bare from the waist up. Age in the twenties and has platted [braided] hair." (TT Vol. IV at 1276.) Furthermore, Officer Scanlon stated that "[h]e had seen him [the shooter] before ... but he just could not remember his name." (TT Vol. IV at 1277.) After testifying to the identification of the shooter, Detective Stotlemyer continuously read from his report in which Officer Scanlon recounted the events that proceeded and concluded in the death of Officer Wallace. (TT Vol. IV at 1278–82.)

In the Amended Petition, Petitioner argues that from pages 1278–1283, Detective Stotlemyer was asked questions concerning his interview with Officer Scanlon. (Doc. # 30 at 26.) However this statement is inaccurate because at trial Detective Stotlemyer continuously and uninterruptedly read from his report detailing Scanlon's account of what took place the day Officer Wallace was shot. (TT Vol. IV at 1278–82.)

Officer Freeman testified from his report to the route that the officers took to arrive at the scene of the shooting. (TT Vol. IV at 1388.) Further, Officer Freeman testified from his report that Officer Scanlon waived a grey cadillac by, and subsequently upon coming behind the parked grey cadillac, a woman who was talking to the passenger crossed the street in front of the officers. (TT Vol. IV at 1388–89.) These statements concluded Officer Freeman's testimony and Attorney Schwartz chose not to cross examine the witness. (TT Vol. IV at 1389.)

■ As to this issue, Petitioner fails to present a claim cognizable in federal habeas corpus. As previously noted, "errors of state law, including evidentiary errors, are not cognizable in habeas corpus as such." *Derden v. McNeel,* 978 F.2d 1453, 1459 (5th Cir.1992) (*en banc*) (citing *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Marshall v. Lonberger,* 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983)), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993). "Errors of state law rise to constitutional dimension only if they 'so infused the trial with unfairness as to deny due process of law.'" *Id.* (quoting *Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941)).

■ Petitioner has not demonstrated that the introduction of hearsay testimony by Detective Stotlemyer and Officer Freeman "so infused the trial with unfairness as to deny due process of law." Officer Scanlon himself took the stand and identified Stanton Story, evidence far more damaging than Detective Stotlemyer and Officer Freeman's recounting of Officer Scanlon's report concerning the events of that day. Under the circumstances, even if Attorney Schwartz should have objected to this testimony, Petitioner has not demonstrated how his trial was infused with unfairness as a result. Therefore, as to these claims, the petition should be denied.

*William Bebler's Testimony About the Cadillac*

■ Petitioner argues that William Bebler's testimony about the cadillac was irrelevant and that counsel should have objected to its introduction. William Bebler testified that he found the grey cadillac at 124 East Broad Street, Tampa Florida. (TT Vol. IV at 1418.) Further, Mr. Bebler testified that he copied the grey cadillac's serial number down and noted it had a temporary Pennsylvania license plate. (TT Vol. IV at 1418–20.) His testimony was later connected with that

of Scott Gray, who testified that he sold a grey cadillac to a "Robert Story." (TT Vol. IV at 1554–55.) [27]

However, Petitioner admitted that he bought the car and forged his brother's signature on the bill of sale. (TT Vol. V. at 1644.) Moreover, Petitioner admitted that the car was driven to Charlotte, North Carolina and that he traveled to Tampa. Thus, evidence that the car was found in Tampa was relevant to the issue of flight and counsel was not ineffective for failing to object to it. Petitioner has not demonstrated how his trial was infused with unfairness as a result of this testimony. Therefore, as to this claims, the petition should be denied.

*Testimony of Alene Smith and Nadine Brown*

 Officer Robert W. McKay testified to the unavailability of two witnesses, Alene Smith and Nadine Brown. These two witnesses had resided at 124 East Broad Street, Tampa Florida, and had previously testified at Petitioner's first criminal trial in 1975. Officer McKay testified that he had contacted both the Tampa Police Department and the Daytona Police Department but was unable to locate the witnesses because they had left no forwarding address. (TT Vol. IV at 1431–34.)

Attorney Schwartz, in chambers, objected to the absent witnesses' testimony on the ground that the Commonwealth did not in good faith attempt to locate them. According to Attorney Schwartz, Officer McKay did not send a registered letter, did not send a subpoena, and did not personally attempt to locate the witnesses. (TT Vol. IV at 1463.) The Court overruled his objection based on a Pennsylvania rule of evidence, 19 P.S. § 582 (repealed, *now see* 42 Pa.C.S. § 5917). (TT Vol. IV at 1467.)

Attorney Schwartz also objected to the absent witnesses' testimony as prejudicial because it admitted into evidence the names of black revolutionaries. (TT Vol. IV at 1468.) The Court overruled this objection because

the names were relevant to the issue of flight. (TT Vol. IV at 1468.)

Furthermore, Attorney Schwartz objected to the admissibility of questions that rose to the level of a confession, specifically, "Did you ever discuss with Story why he was in Tampa? He told me that he was in trouble. In trouble? Yeah, in big trouble." (TT Vol. IV at 1473.) The Court overruled this objection on the grounds that "[a] statement made by a defendant to a third party is not subject to any *Miranda* warnings of any type. Only when it's made to a police officer.... A statement made by the defendant is admissible any time that it's made to a third party." (TT Vol. IV at 1474.)

The Court deleted certain portions of Alene Smith's and Nadine Brown's prior testimony on the grounds of relevancy, particularly those parts in which the word conspiracy was used (conspiracy was not charged in this trial), those parts in which weapons were mentioned, and those parts in which Alene Smith was asked whether Story left her house in Tampa for a time. (TT Vol. IV at 1469–75.) Subsequently, the Court permitted the following portions of Alene Smith and Nadine Brown's testimony to be read into evidence.

Alene Smith testified that she met Story, Davis and Jones on a Greyhound bus from Daytona, Florida to Tampa, Florida. (TT Vol. IV at 1483.) Story introduced himself to her as "Makif" while his two associates claimed to be "Malet" and "Karmu." (TT Vol. IV at 1483–84.) She learned the true identities of Stanton Story, Robert Davis, and Lafayette Jones when the F.B.I. showed her pictures of the three suspects. (TT Vol. IV at 1484.) In addition, she testified that Story had a silver grey cadillac, but she did not observe the license plate. (TT Vol. IV at 1487–88.) On cross examination, she testified that all three men, including Story, had braided hair. (TT Vol. IV at 1494.) Furthermore, Story admitted to her that he was from Pittsburgh. (TT Vol. IV at 1496.)

Nadine Brown testified that Stanton Story used the alias "Makif", Robert Davis used

---

27. Apparently, the trial transcript contains an inconsistency in that the serial number that Mr. Bebler testified to was M71777387 (TT Vol. IV at 1418), while Mr. Gray testified twice that the serial number of the car was M7177387 (TT Vol. IV at 1554, 1556).

the alias "Karmu", and Lafayette Jones used the alias "Malet." (TT Vol. IV at 1499–1501.) Further she testified that the F.B.I. informed her of their true identities. (TT Vol. IV at 1501.) In addition, she testified that Story owned a silver grey cadillac. (TT Vol. IV at 1501.) When asked if she knew why Story was in Tampa, Florida, Mr. Gettleman, petitioner's counsel at the first trial, had objected on hearsay grounds, but the Court had overruled the objection. (TT Vol. IV at 1503.) Accordingly, the following exchange took place between the Commonwealth and the witness:

A. He told me that he was in trouble.

Q. In trouble?

A. Yeah. In big trouble.

Q. In big trouble. Did he say where?

A. He said up North.

(TT Vol. IV at 1503.)

On cross examination, Ms. Brown testified that the F.B.I. showed her pictures of the three men and identified them by name. (TT Vol. IV at 1506.) Further she testified, "I identified them as Malet and Karmu, and they didn't have a picture of Makif, and they left and when they came back they showed me a picture of him and told me his name, Stanton Story, and I identified him as Makif." (TT Vol. IV at 1506.)

The Court proceeded to question her further about the F.B.I. identification process and the following exchange took place:

Q. And they came back later and showed you his [Story's] picture?

A. Yes.

Q. And it was when you first identified—

A. Yes.

Q. Then they told you what his name was?

A. Right.

(TT Vol. IV at 1507.)

Petitioner argues that the introduction of this testimony infringed his rights under the Confrontation Clause of the Constitution and the Due Process Clause because only portions of the testimony were read into evidence. The Supreme Court has held that:

The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. See *Mancusi v. Stubbs,* 408 U.S. 204 [92 S.Ct. 2308, 33 L.Ed.2d 293] (1972); *Barber v. Page,* 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968); *Motes v. United States,* 178 U.S. 458 [20 S.Ct. 993, 44 L.Ed. 1150] (1900); *California v. Green,* 399 U.S. [149,] 161–162, 165, 167 n. 16 [90 S.Ct. 1930 1936–1937, 1938, 1939 n. 16, 26 L.Ed.2d 489 (1970) ].

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts,* 291 U.S. [97,] 107 [54 S.Ct. 330, 333 78 L.Ed. 674 (1934) ].

*Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980) (footnote omitted). The Court summarized its analysis in *Roberts* as follows:

[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.

*Id.* at 66, 100 S.Ct. at 2539. *See also Bourjaily v. United States,* 483 U.S. 171, 181–84, 107 S.Ct. 2775, 2781–83, 97 L.Ed.2d 144 (1987); *United States v. Caputo,* 758 F.2d 944, 950–52 (3d Cir.1985).

In this case, the trial court concluded that Alene Smith and Nadine Brown were un-

available to testify and that the prosecution had made a good-faith attempt to locate them. Attorney Schwartz objected on the grounds that Officer McKay did not send a registered letter, did not send a subpoena, and did not personally attempt to locate the witnesses. (TT Vol. IV at 1463.) The trial court overruled this objection, and permitted the testimony. As the Supreme Court held in *Roberts*, "[o]ne, in hindsight, may always think of other things [the prosecution might have done]." *Id.* at 75, 100 S.Ct. at 2544. However, in this case the witnesses had testified at Petitioner's first trial and the prosecution had no reason to believe that they would not appear at the second trial. Therefore, the prosecution cannot be blamed in hindsight for not knowing it should have begun a search for these witnesses earlier.

With respect to the issue of "indicia of reliability," it has long been held that when a witness testified and was cross-examined at a prior trial, there are sufficient indicia of reliability to permit that witness' testimony to be introduced at a second trial. *See Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). Therefore, Petitioner has not demonstrated that the introduction of this testimony violated his rights under the Confrontation Clause and as to this issue, the petition should be denied.

Petitioner also claims that his due process rights were violated when only portions of the testimony were read into the record. However, a review of the trial court's ruling demonstrates that Judge Ross deleted those portions of the testimony that would have been irrelevant to the case and would have prejudiced Petitioner. The Court deleted those portions of Alene Smith's and Nadine Brown's prior testimony in which the word conspiracy was used (conspiracy was not charged in this trial), those portions in which weapons were mentioned, and those parts in which Alene Smith was asked whether Story left her house in Tampa for a time. (TT Vol. IV at 1469–75.) Thus, Petitioner has failed to demonstrate how the deletions of these portions of the testimony deprived him of his due process rights and as to this issue, the petition should be denied.

*Peter Marone's Testimony*

Peter Marone was the chief criminalist of the Allegheny County Crime Laboratory, and he testified as an expert on firearms. (TT Vol. IV at 1202.) Attorney Schwartz was "willing to stipulate to his qualifications as a criminalist, but firearms I think should be left to somebody else." (TT Vol. IV at 1205.) Mr. Marone testified to his qualifications as a firearms expert:

> Approximately the first six months to a year that I was employed at the Allegheny County Crime Laboratory I also worked particularly in the firearms section. During that time, I received some training under then firearms examiner Lieutenant William Valenta. During the course of that training period and the few years after that, I examined numerous firearms cases. I have no idea the exact number—I would say a few hundred anyway—and have testified in other cases as to firearms identification.

(TT Vol. IV at 1205.)

On cross examination, Marone elaborated on his training in firearms:

> So that some of the master's degree program dealt with training. The training at the laboratory was an on-the-job-type of training. Reworking cases, examining firearms, working cases, and then the cases would then be reworked to a point where ... Lieutenant Valenta felt confident in my ability to work as a firearms examiner. That was over the period of six months to a year.

(TT Vol. IV at 1206.)

Attorney Schwartz questioned whether Marone ever received a certificate from a school certifying his expertise in firearms, Marone replied, "there are no schools that specialize [in training] people. It is an on-the-job training type of process. There is no certification process." (TT Vol. IV at 1207.) Subsequently, the Court permitted Marone's testimony as a firearms expert. (TT Vol. IV at 1207.)

Thus, Petitioner is in error when he contends that Attorney Schwartz was ineffective for failing to object to Marone's testimony, as the record reflects that Attorney Schwartz

objected at length and his objections were overruled. Therefore, as to this issue, the petition should be denied.

### Destruction of Handwritten Notes

 Detective Joseph Stotlemyer testified from a report he prepared when he took notes from an interview with Officer Scanlon at Columbia Hospital. (TT Vol. IV at 1275–76.) On recommendation from Attorney Schwartz, the Commonwealth laid the proper foundation and Detective Stotlemyer testified that he took notes during his interview with Officer Scanlon and transcribed them in to a report. (TT Vol. IV at 1275–76.) On cross examination, Detective Stotlemyer admitted, "I don't save notes. They are transcribed and then destroyed." (TT Vol. IV at 1321–22.) He later explained that he has followed this procedure in "hundreds of other homicide cases, yes. I make my report and I destroy my notes. I just don't have the storage space...." (TT Vol. IV at 1334.)

Officer Ronald Freeman testified from a report he made from an interview conducted with Officer Scanlon at the Public Safety Building. (TT Vol. IV at 1386–87.) Attorney Schwartz objected stating, "I would request that the witness explain for the record that this is not his present recollection, that he is using the report." (TT Vol. IV at 1386–87.) Officer Freeman testified he took notes during the interview, typed up his report and after comparing the report to his notes for accuracy, he then destroyed his notes. (TT Vol. IV at 1387.)

Petitioner also raises the issue of appellate counsel's ineffectiveness for not raising trial counsel's failure to object to Detective Swearingen's testimony, because he "had taken handwritten notes and thrown them away prior to trial." (Am. Pet. at 31.) However, at trial, Detective Swearingen denied taking any notes during the conversation with Story in the police car or at the Public Safety Building. (TT Vol. IV at 1543.)

The Supreme Court has held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). *See also Unit-*

*ed States v. Ramos,* 27 F.3d 65, 69 (3d Cir. 1994); *United States v. Deaner,* 1 F.3d 192, 199–201 (3d Cir.1993); *Commonwealth v. Pickering,* 368 Pa.Super. 100, 533 A.2d 735, 736 (1987), *appeal denied,* 522 Pa. 611, 563 A.2d 497 (1989) (police destruction of notes violates confrontation clause *only if* it occurs following a request for their discovery and given that substance was incorporated into written reports, the notes themselves would have been cumulative).

In this case, the police testified that the substance of their handwritten notes was transferred to official reports. (TT Vol. IV at 1386–87, 1579, 1582.) The substance of these reports was raised at trial, and Attorney Schwartz had the opportunity to, and in fact did, cross-examine police officers on the material in the reports and any facts that might have been left out of the written reports. (TT Vol. IV at 1578.) Under the circumstances, therefore, Petitioner has not shown that the police acted in bad faith in destroying their handwritten notes, or that he was deprived of due process because these handwritten notes were not available at trial. Therefore, as to this claim, the petition should be denied.

### Certificate of Appealability

 The decision whether to grant or deny a certificate of appealability is "[t]he primary means of separating meritorious from frivolous appeals." *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). If a certificate of appealability is granted, the Court of Appeals must consider the merits of the appeal. However, when the district court denies a certificate of appealability, the Court of Appeals can still grant one if it deems it appropriate. 28 U.S.C. § 2253.

"A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (amended Apr. 24, 1996). Although the petition for writ of habeas corpus should be denied, this petition does at least present an issue "debatable among jurists of reason." *Barefoot,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. *See Heiser v. Ryan,* 813 F.Supp. 388, 404 n. 16

(W.D.Pa.1993), *aff'd,* 15 F.3d 299 (3d Cir.), *cert. denied,* 513 U.S. 926, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994).

Section 2253(c)(3) requires the court to identify the appealable issue. The issue of whether subjecting Petitioner to the death qualification of the jury when the state supreme court later determined that he was not eligible for the newly enacted death penalty presents an issue of first impression. Following *McCree, Buchanan* and other relevant cases, the Court predicts that the Supreme Court of the United States would not grant habeas corpus relief under these circumstances. Nevertheless, the issue is one about which reasonable minds could differ, as demonstrated by Judge Cowen's dissent from the Court of Appeals' decision remanding the case to this Court. The Commonwealth concedes that a certificate of probable cause should issue, particularly given Judge Cowen's dissent on the death qualified jury issue and the importance of this issue. Accordingly, a certificate of appealability should be granted with respect to this issue.

Therefore, it is recommended that the petition for writ of habeas corpus be denied. It is further recommended that a certificate of appealability be granted with respect to the issue of whether Petitioner was deprived of his Sixth Amendment right to be tried by an impartial jury by reason of the fact that his jury was death qualified.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.